## The Estate of the North American Land Company. Halsey's Appeal — Ingersoll's Appeal — Dale's Appeal.

1. By articles forming the North American Land Company, Morris and others guaranteed 6 per cent. dividends, and pledged stock as security; the agreement organizing the company provided for a change in the articles. A material change was afterwards made. *Held*, that the pledgors were not bound unless it clearly appeared that they had agreed to transfer their guaranty to the organization as changed.

2. Contemporaneous construction is not conclusive, but if any doubt rests upon the question, or a very long period has elapsed before it was made, it is an argument entitled to great weight.

3. The articles of association and proceedings of the North American Land Company considered and construed.

January 14th 1869.     Before THOMPSON, C. J., READ, AGNEW, SHARSWOOD and WILLIAMS, JJ.

Sur exceptions to the special report, under the order of the Supreme Court, of John M. Collins, Esq., auditor, appointed by the Court of Common Pleas to distribute the balance appearing on the second account of James Dundas, surviving trustee of the North American Land Company (Halsey's Appeal), No. 281, to January Term 281.

Robert Morris, John Nicholson and James Greenleaf, being owners of 6,000,000 acres of land in different states of the Union, projected the North American Land Company, which was formed on the 20th day of February 1795 by articles of agreement dated that day, "by and between Robert Morris, John Nicholson and James Greenleaf, of the one part, and those who shall become purchasers, owners or holders of shares in the North American Land Company, of the other part."

The preamble to the articles set forth: "The titles to these estates are vested in trustees as joint tenants in trust to convey the same to purchasers conformably to the articles of agreement hereto annexed; the moneys arising from the sales thereof are for the use and account of the holders or possessors of the shares in the stock of the North American Land Company."

The articles were 28 in number.

Article 2d. "Every owner of one or more shares shall become a member thereof, and a party to these articles, in virtue of such ownership, as fully to all intents and purposes whatever as if such owner had actually signed and sealed these presents, and cease to be so when he parts with his share or shares."

Art. 5th. "The said capital stock in lands shall be represented by thirty thousand shares or actions of 200 acres each, so as that every person holding a share or shares will be entitled to

one-thirty-thousandth part of the said capital stock of lands, or the moneys and profits resulting therefrom upon each share."

By the 8th article the "board of managers for the year 1795, named in the articles, were Robert Morris and four others, to continue until the 31st of December in that year, when the first election was to be held.

Art. 11th. "All covenants, articles of agreement, or contracts made by the board of managers, or by their agents, for the sale of lands, shall be to and in the name of the individuals composing the board, and shall be to them, and the survivor of them, and the executors and administrators of such survivor, to this intent expressly, that suits shall be brought in their names for the use of the said company. And that if such persons shall cease to become members of the board, then suits may be brought and maintained in the name of them, or the survivor of them, or the executors or administrators of the survivor of them, for the use of the said company," &c.

The 22d article provided that at the end of each year, after paying expenses and reserving a contingent fund not exceeding $4000, the managers should declare a dividend of the remaining cash balance on hand; and if the receipts should at any time justify it, one or more dividends might be declared in a year.

Art. 23d. "It is agreed by the said Robert Morris, John Nicholson and James Greenleaf, parties of the first part, that the dividend or dividends shall not be less than 6 per cent. per annum, or $6 on each share in every year, and that if the cash arising from the sales does not amount to that sum, they, the said parties of the first part, do hereby promise and bind themselves, their heirs, executors and administrators, to advance and lend to the board of managers such sum as may be necessary, in addition to what they have in hand of the company's money, to enable them to pay $6 on each share, the board of managers granting their obligation to the said parties of the first part to repay the said advances out of the first moneys they may receive thereafter on account of the company, except such as the said board are obliged, by article the 4th, to pay to persons recovering against the board, and also excepting the moneys reserved for a contingent fund; and in order to secure the performance on the part of the said parties of the first part, they do hereby agree to deposit in the hands of the trustees each three thousand shares or actions, making in all nine thousand shares, to be held by them for the use of Robert Morris, John Nicholson and James Greenleaf respectively, subject, however, to the payment of such sum or sums, in any or every year during the continuance of this company, as may be necessary to enable the board of managers to pay a dividend of 6 per cent.; and they are hereby authorized to sell and transfer so many shares as may be needful for that pur-

[Estate of the North American Land Co.]

pose, in case the said Robert Morris, John Nicholson and James Greenleaf, or some of them, their or some of their heirs, executors or administrators fail to provide, by other means, the sums necessary, the sums of money arising from such sales of deposited shares to be in the first instance applied to the payment of the dividend, and afterwards the same sums to be replaced from the company's funds which shall be reinvested in shares for account of the said Robert Morris, John Nicholson and James Greenleaf, and the shares so purchased shall again be deposited as before and for the same uses and purposes, it being understood that the said parties of the first part are to draw the annual dividends on their respective parts of the deposited shares."

Art. 26th. " Certificates for thirty thousand shares or actions will be immediately made out, signed and delivered to the parties of the first part, after the execution of these articles, in the following form: ' This is to certify that          is entitled to share   in the entire property of the North American Land Company, the dividends whereof shall not be less than $6 on each share annually, conformably to articles of agreement duly executed, dated at Philadelphia, the 20th day of February 1795. Transferable only at the company's office in that city by the owner in person, or by his executor, administrator, attorney or legal representative. Signed in the presence and by order of the Board of Managers, at Philadelphia, this          day of          17          President.     Attest,          Secretary.' "

Art. 27th. " This company shall exist for fifteen years (unless the sales of their lands and the collection of the moneys shall be sooner effected), and as much longer as may be necessary to close and settle their concerns and make a final dividend. At the end of fifteen years from the date of these articles of agreement, it shall be the duty of the then board of managers to call, by advertisements in the newspapers, upon the shareholders to appear in person or by proxy at a meeting to be held at the company's office six months after the date of such advertisement, and there to determine upon the best mode of disposing of any part of the company's estate that may then remain unsold or uncollected, so as to make a just and final division thereof, and a majority of votes given by the shareholders and proxies that meet shall be conclusive. The said board shall carry the same into effect, and make a final dividend thereof as soon thereafter as may be practicable."

Art. 28th. " It is further agreed that if upon experience it shall be found necessary to alter, amend, add to or diminish these articles of agreement, the same may be done upon the following terms and conditions, and on no other: The person or persons wishing for an alteration shall propose the same at an annual meeting of the shareholders by laying the proposed changes before

[Estate of the North American Land Co.]

them in writing, and if such changes or alterations, or any part thereof, meet the approbation of a majority of the shareholders and proxies then met, the propositions so laid before them shall be printed, with notice that decision is to be made thereon at the next annual meeting, and copies thereof be transmitted to every shareholder who shall leave his address at the office for that purpose, at his expense and as he shall direct; when, two-thirds of the whole number of shareholders and proxies then met concurring or agreeing to the said changes or alterations, or any part thereof (provided that the said two-thirds of the shareholders and proxies represent not less than two-thirds of the whole number of shares), the same shall become a part of these articles, and be incorporated in this plan, and be binding upon all concerned as if the same had been now inserted and accepted."

On or before March 1795, 22,365 shares of stock had been issued to various persons by Morris, Nicholson and Greenleaf. This number of shares, instead of 30,000, was issued because the title to the lands beyond about 4,500,000 acres proved invalid. For the same reason only 7455 shares were transferred to Willing, Nixon and Barclay, the trustees under the 23d article, as a guaranty for the payment of 6 per cent. dividends.

By articles of agreement, made the 28th day of May 1796, between James Greenleaf of the one part and Messrs. Morris and Nicholson of the other part, Greenleaf agreed to sell to Morris and Nicholson his whole interest in the North American Land Company, consisting of 10,000 shares, for the sum of $1,150,000, payable in negotiable orders of the said Morris and Nicholson, one-half Morris's drafts on Nicholson; the other half Nicholson's on Morris, and falling due in one, two, three and four years from date; and further, that Greenleaf was not to transfer said shares until the said orders were paid, and upon default in payment might sell enough shares to pay the orders, but should proportionally transfer as Morris and Nicholson paid the orders: and Greenleaf agreed, within nine months, to have retransferred to himself such of his said shares as did not then stand in his name; and Morris and Nicholson covenanted to indemnify Greenleaf against the 6 per cent. dividend clause in the original articles.

Shortly after this Greenleaf pledged the orders or drafts of Morris and Nicholson received in pursuance of said articles, to sundry persons as a security for the performance of his own engagements.

On the 30th day of September 1796, Greenleaf executed to George Simpson, partly for the benefit of said pledges, the indenture commonly known as the "381" trust deed, conveying a large amount of real and personal estate, including shares in the North American Land Company, in trust, to sell and pay the persons to whom he had pledged these orders as well as others.

[Estate of the North American Land Co.]

On the 26th of February 1797, Simpson conveyed to Henry Pratt and others all the property in the "381" deed to be held upon the same trusts as therein declared.

At the date of said "381" deed the greater part of Greenleaf's shares stood on the books of the company in the names of other persons who had been acting as the agents of Greenleaf for the sale thereof, &c.

The drafts not having been paid the shares were never transferred to Morris or Nicholson, and on the 8th day of March 1797, Greenleaf, by sixteen separate assignments, each of that date, conveyed to said Henry Pratt and others, upon the trusts created by the "381" deed, the shares in said sixteen assignments specified,—the 10,000 shares sold to Morris and Nicholson being included therein.

Three of these assignments were of similar form and conveyed to the trustees "2545 shares of the entire property of the North American Land Company, which remain as a balance of 10,000 shares of said company which was the original share or portion of me, the said James Greenleaf, in the said North American Land Company, and for which certificates have not yet issued, together with the dividends due or in arrears thereon, and all my right, interest, property, claim and demand of, in, to or out of the same, 'subject to the conditions, &c., in the deed to Simpson. The remaining assignments, alike in form, conveyed' 2485 shares of the entire property of the North American Land Company, which are the said James Greenleaf's share or part of 7455 shares of the said company, transferred to Thomas Willing, John Nixon and John Barclay, Esq., in order to secure the payment of the dividends on the shares of said North American Land Company, and for which certificates were issued in their names, by No. together with the dividends due or in arrears thereon, and all my right, interest, property, claim and demand of, in, to or out of the same, 'subject also to the conditions, &c., of the deed to Simpson.'" Only 6119 of the shares mentioned in these assignments were transferred to Pratt and the other trustees named in the sixteen assignments."

The guarantors advanced as much as would pay dividends for two years, after which they all were hopelessly insolvent.

The affairs of the company having become much embarrassed, and it being found impracticable to go on under the original articles, alterations were on the 31st of December 1806 proposed and approved by a majority of the stockholders, under the provisions of article 28. Such alterations, however, required for their ratification the votes of two-thirds of the shareholders, representing that proportion of shares at the next annual meeting. The trustees holding the deposited shares were not willing to vote upon them at the meeting. In consequence, under the advice of coun-

[Estate of the North American Land Co.]

sel, that the concurrence of the trustees was not necessary to a sale, the board of managers on the 22d of October 1807 instructed the secretary to advertise the deposited shares for sale on the 30th of November 1807. On the 23d of October 1807, Greenleaf, then secretary of the company, advertised for public sale the 7455 deposited shares; they were publicly sold on November 30th 1807, and bought by T. Willing Francis, for 7 cents per share, producing the sum of $518.24 after deduction for expenses. They were by the managers transferred to Mr. Francis; the old certificates were cancelled, and a new one issued to him, which remains uncut from the certificate book. Mr. Francis gave a contemporaneous declaration that he bought them in for the managers of the company, and agreed to transfer them on their request, it appearing that he was employed by them only to protect the interest of the company by bidding. On the 31st of December 1807, Mr. Francis, as the agent of the said managers, voted the said 7455 deposited shares in favor of the said alterations, and these, together with other shares voted, amounted to 17,132, more than the required two-thirds; and the supplemental articles, entire as they had been proposed, were finally adopted.

These articles are as follows:—

1. That all the business and concerns of the North American Land Company shall henceforward be managed and conducted by Henry Pratt, John Ashley, John Vaughan, Robert Porter and John Miller, Jr., or a majority of them, their survivors or a majority of such survivors, who shall have full, unlimited and uncontrolled powers to barter, sell or convey all or any part of the land or property of the said company, on whatever terms and conditions they may judge fit; and also to act in all possible cases regarding the affairs of the company, as they may deem most expedient and proper.

2. That John Nixon and John Barclay, the trustees of the company, shall have power to transfer or convey, and shall transfer or convey to the said Henry Pratt, John Ashley, John Vaughan, Robert Porter and John Miller, Jr., as aforesaid, by deed of quitclaim, or other competent conveyance, all the lands and property of the company vested in them, either in law or equity, for the benefit of the company; and also all shares of stock of the company that may have been transferred to them, or in their names, under the twenty-third article of the agreement aforesaid. And that the said John Nixon and John Barclay shall, on making such competent conveyances or transfers, for ever after be held harmless and blameless for any and all neglects, or pretended neglects; and for any and all doings which may have happened or occurred while they were considered the trustees of the company.

3. That all the shares of stock that may be transferred under

the preceding article, shall be considered as held by the before-named managers of the company, in manner as aforesaid, for the benefit of the stockholders of the company, in lieu of arrearages of interest, and to be shared among them *pro ratâ*.

4. That whenever the lands and property of the company shall have been all sold, and the conditions of sale complied with, the said managers of the company shall, by public advertisement, call a meeting of the stockholders, and shall divide among them the proceeds of the same, according to their respective interests therein.

5. That whatever may, in any of the articles of the aforesaid agreement of 20th February 1795, prove repugnant to or incompatible with the supplementary articles now agreed to, shall be and is henceforward declared to be for ever rescinded and annulled.

After the adoption of the supplementary articles, the managers, at a meeting on the 4th of February 1808, adopted a new certificate for stock, reported by the secretary, in the following form:—

"NORTH AMERICAN LAND COMPANY.

Certificate, No.
　　　　　　representing shares, No.　　　　　to
THIS IS TO CERTIFY, that
　　　　　　entitled to　　　　　　　　　　shares
in the entire property of the NORTH AMERICAN LAND COMPANY. Transferable only at the company's office in Philadelphia, by the owner in person, or by his executor, administrator, attorney or legal representative."

At the same meeting the managers resolved, that as Morris and Nicholson were deeply indebted to the company, no transfer of stock should thereafter be admitted, nor interest thereon granted or paid unless by consent of a majority of the managers, where there is reason to believe that Morris or Nicholson have any equitable interest in or claim to said shares. The North American Land Company was never incorporated.

The trustees under the original articles, on the 27th of April 1808, conveyed the lands held under those articles to the managers appointed under the supplementary articles. They, on the 1st of May 1838, conveyed them to Benjamin Kugler, James Dundas and others, under the trusts in the articles.

Pratt died in 1838, and his executors, October 12th 1843, conveyed to Dundas, the accountant, upon the original trusts, all the property vested in Pratt by Simpson's conveyance, and included in the "381" trust.

Dundas and Kugler having survived their fellow-trustees, on the 27th of January 1856 filed an account of their trust under the

[Estate of the North American Land Co.]

supplementary articles, showing in their hands a balance of $92,071.87, which was referred to J. A. Phillips, Esq., for distribution.

He reported that the fund should be distributed amongst all, who by the books and certificates appeared to be the legal owners of the shares. This distribution gave a dividend to James Dundas on the 6119 shares, which he held under the trusts in the assignments to Pratt and others, and excluded the 2455 shares deposited as security for the 6 per cent. dividends. The distribution was approved by the Supreme Court in Moss's Appeal, 7 Wright 23.

James Dundas having survived Kugler filed a second account in 1862, which was referred by the Court of Common Pleas to John M. Collins, Esq., as auditor, for distribution. The balance, as appeared by his report, after deducting expenses, was $50,312.58. This he reported, in accordance with the decision in Moss's Appeal, should be distributed amongst all the shareholders named in the report of Mr. Phillips, excepting the estate of James Greenleaf. The result was that he divided the fund amongst 13,354 shares, which included the 6119 shares held by Dundas under the " 381" trust. Exceptions to the auditor's report were filed by E. Ingersoll, administrator, &c., of Jared Ingersoll, deceased, by W. S. Halsey, administrator of John Nicholson, deceased, and Margaret Dale, administratrix, &c., of James Greenleaf, deceased. The exceptions were dismissed, and the report of the auditor was confirmed by the court below.

From this decree the administrators of Nicholson, of Ingersoll and of Dale appealed.

Halsey, administrator of Nicholson, was represented by *E. S. Lawrance;* Dale, administrator of Greenleaf, was represented by *S. G. Thompson; E. Ingersoll,* administrator of Ingersoll, argued for that estate; *E. Waln* represented Marshall's executor and other shareholders; *W. F. Judson, W. M. Tilghman* and *E. S. Miller,* represented James Dundas, trustee, and others interested under the " 381" trust.

After the argument the report was remitted to the auditor, " to examine and report to this court what effect, if any, the adoption of the supplementary articles had on the 23d article."

The auditor made a report under this order, in which, after recapitulating the facts, &c., in connection with the adoption of the supplementary articles, he says :—

" Now it is manifest from this history, that the said shares were not sold with the design of raising money to pay dividends, but with the design of getting control of the shares, in order to make up the two-thirds vote requisite to adopt said supplementary articles. And this more especially appears—1st, from the fact that the managers and shareholders did not treat the shares as merged,

[Estate of the North American Land Co.]

but kept them alive, and voted upon them; and 2d, from the fact that the shareholders did not omit the 3d supplementary article, and part of the 2d, which had reference to said shares, as they, of course, had a right to do, and as they might naturally have been expected to do, if they had not intended to adhere to the original purpose of taking the shares in lieu of the arrearages; but they said still, by their vote on the 31st of December 1807, that they took the said shares, to which they had already acquired title, for another purpose in anticipation of this vote, in lieu of said arrearages; so that, when they said that 'all the shares that may be transferred under the preceding article' should 'be considered as held,' &c., they meant simply the said 7455 shares as they then stood, and it would seem inequitable to hold otherwise. All the shareholders who voted, therefore, released the arrears due under the 6 per cent. covenant.

"2d. As to those stockholders who did not vote, but whose representatives have accepted dividends under the first report and decree of the court, it is only necessary to say that (apart from their being bound by the act of the other shareholders and managers) said representatives, having reaped the benefit of the compromise by taking its fruits, have ratified said agreement to receive said deposited shares in lieu of arrearages: Evans v. Wells, 22 Wend. 324.

"3d. As to the remaining shareholders who have not yet taken their dividends under said first report (the distribution in which proceeded on the basis of excluding the deposited shares), apart from the acquiescence of long silence, they were concluded by the act of the required majority of shareholders. Even in ordinary partnerships, in the absence of any express stipulation, a majority may decide as to the disposal of the partnership property. The act of the majority, done in good faith, binds the firm between themselves, unless special provision is made to the contrary: Kirk v. Hodgson, 3 Johns. Ch. R. 400; Combe v. Boswell, 1 Dana R. 495; Le Page v. McRea, 1 Wend. 164; and many other cases.

"If this were otherwise, all the shareholders in this case who did not vote, it is submitted, were certainly bound by the act of the managers in joining in said release of arrearages. By Francis, their agent, said managers voted to adopt the alterations, and by that act must be taken to have discharged Morris, Nicholson and Greenleaf, or their representatives, from the arrears of the 6 per cent. due to them (said managers) for the company, and thus bound at least all shareholders who did not dissent. It is not material that there is no express provision in the original articles giving authority to compound claims. In joint stock companies like this, in matters which might have been but are not provided for by the deed of settlement, the general law of partnership must prevail: Baldwin v. Lawrence, 2 Sim. & Stu. 18.

[Estate of the North American Land Co.]

" Now one partner may, even by deed, release a debt due to the firm and bind his copartners:     *     *     *     3 Kent Com. 49; Cunningham *v.* Littlefield, 1 Edw. Ch. 104; Salmon *v.* Davis, 4 Binn. 375; Parke *v.* Smith, 4 W. & S. 290. It matters not, therefore, whether the debtors discharged are members of the firm or strangers. In the present instance the managers were something more than mere partners. They were expressly made the general agents of the firm to receive and disburse moneys, to sue and be sued, &c. Morris, Nicholson and Greenleaf did not covenant to pay the 6 per cent. to the shareholders, but to lend money to the managers to make up the 6 per cent., and the equities of the partners were to be worked out through the managers alone: so that their authority to compound seems clear. In December 1807, Morris and Nicholson were dead, and their estates utterly insolvent; and Greenleaf was a certificated bankrupt; their 6 per cent. covenant was worthless and likely to remain so: in view of which the managers, on behalf of the non-voting shareholders, practically said: ' This enterprise being in danger of ruin, we think it for the best interests of the shareholders, whom we represent, to take the deposited shares, which are worth something, in full accord and satisfaction of the debt Morris, Nicholson and Greenleaf or their estates owe for arrearages on their 6 per cent. covenant to us for the shareholders, and release them and their estates therefrom.' This it is submitted they had a right to do. They voted thus to take the shares, caused them to be transferred to the new managers, who and whose successors have held them ever since, without objection so far as known from any shareholder.

" Said release applied only to the ' arrearages.' The next question concerns the effect of the supplementary articles upon the said 6 per cent. covenant itself.

" 1st. The agreement of Morris, Nicholson and Greenleaf, in the beginning of the 23d article, that the dividends should not be less than 6 per cent. per annum, or $6 on each share, is not a personal covenant with the shareholders separate and distinct from that which immediately follows, to advance and lend to the board of managers such sum as might be necessary, &c., to enable them to pay $6 on each share; for it seems clear that if a shareholder had brought an action upon said first agreement against Morris, Nicholson and Greenleaf for arrears, they could have successfully pleaded in bar that they had lent the board of managers the sum necessary to pay the arrears. Said two agreements are therefore connected so as to form one covenant to lend the board, in case of a deficiency from sales, the sum necessary to make up 6 per cent. Now this covenant is to lend such sum only on condition that the board of managers grant their obligation to said Morris, Nicholson and Greenleaf to repay said advances out of the first

moneys they might receive thereafter on account of the company, &c. This condition is equivalent to a covenant on the part of the managers: Roberts v. Marston, 20 Maine R. 275; St. Albans v. Ellis, 16 East 355; Levering v. Phillips, 7 Barr 391–2. Now, by the first supplementary article five persons were appointed managers of the company, with unlimited powers to sell the property of the company, 'and also to act in all possible cases regarding the affairs of the company as they may deem most expedient and proper.' These new appointees became managers, trustees, and everything else necessary to carry on the company's business, &c.; and, in accordance with the fifth supplementary article, that whatever in the old articles might 'prove repugnant to or incompatible with the supplementary articles,' was rescinded and annulled, the obligations of the old managers were annulled, and were not imposed on the new ones. Hence the duty of the managers to grant their obligation to Morris, Nicholson and Greenleaf, prescribed by the said 23d article, was gone, and the covenant of said three men to lend money to the managers to make up 6 per cent. was likewise extinguished from that moment. Both were to be bound, or neither were liable for want of mutuality. The other stipulations in the said 23d article were also rendered nugatory, viz., the authority to sell the deposited shares, the obligation to apply the proceeds of sales to the payment of the dividends and re-invest in shares for Morris, Nicholson and Greenleaf, and the right of said three to draw the dividends. Indeed, nearly all the provisions of the old articles were abrogated by the supplementary articles conferring 'unlimited' powers upon the new managers. It is old law that the covenantor will be discharged from his contract if by any act or omission of the covenantee he be incapacitated to perform it; as where the lessors covenanted to find eight men to grind every day at a corn-mill, and the lessee pulled down the corn-mill and made it a horse-mill: held, that the lessors were discharged from their covenant: The City of London v. Greyme, Cro. Jac. 181.

"2d. After the adoption of the supplementary articles, viz., on the 4th of February 1808, at a meeting of the new board of managers, 'the secretary communicated the form of a new certificate of shares, to be issued in all future transfers, which was approved of.' Said managers afterwards issued certificates in that form. A blank certificate is hereto annexed marked 'B.' The only difference between this and the old certificate, in the body of it, is that in this the said 6 per cent. guaranty is omitted. This it is submitted is evidence of one of two things, either that said managers understood and meant to indicate that said 6 per cent. covenant had been annulled by the supplementary articles; or that they themselves, by virtue of the unlimited powers given

10 P. F. Smith—17

them, had released the said covenant, and therefore left it out of the certificate.

"As early as the 29th of December 1806, the old managers determined 'that no new certificates of shares should be actually issued until the tenor of the certificate to have future circulation shall be so altered, as to conform to the *state of things about to be established* for the future management of the company.' Now when we see a certificate afterwards issued which differs from the old simply in the omission of the said covenant, it is reasonable to suppose that '*the state of things about to be established*,' to which the managers referred, so far as it affected the certificate, was the abandonment of said covenant by the shareholders.

"The position taken by the counsel for accountants, that said change in the form of the certificate was the result of a wish on the part of the new managers to avoid deceptive appearances, it is submitted, is untenable; because, first, it was almost as illusory to issue any certificate at all, in the then existing dilapidation of the company's affairs, as to issue one in the old form; and, second, the 26th of the original articles prescribed the form of certificate and required said 6 per cent. covenant to be embodied therein, and it is not likely, if said covenant had not been relinquished, that said new managers would have omitted it from the certificate."

On the coming in of the report, the case was argued by *S. G. Thompson, E. Waln* and *E. S. Lawrance*, for the appellants, and *W. M. Tilghman*, for appellees.

The opinion of the court was delivered, February 15th 1869, by
SHARSWOOD, J.—Every generation seems to have some special bubble. That of the latter part of the last century was speculation in wild lands. It danced and glittered in the sunbeam for a brief existence and then burst. Out of this excitement grew the North American Land Company. The originators of it had gone very largely into the taking up of unappropriated lands, and the company was a scheme evidently to enable them to dispose of them to advantage. They were the owners severally or otherwise of six millions of acres situate in different states of the Union. The property was to be conveyed to trustees, and upon the basis of it 30,000 shares of 200 acres each were to be issued. Only four and a half millions were in fact transferred, the title to the residue having proved imperfect. The whole number of shares issued was 22,365. The number disposed of by the projectors to other persons at home and abroad, generally as payment or pledge for debts or advances, was 8447. In order to promote the sale of the stock, Morris, Nicholson and Greenleaf, by the 23d of the articles of association of February 20th 1795, guarantied "that the dividend or dividends shall not be less than 6 per cent. per

annum, or $6 on each share in every year," and that in case
of any failure of ability in the association to make such a divi-
dend, they would advance and lend to the managers such sum
as with the money in hand would enable them to do so.   Every
certificate of stock issued contained on its face notice of the
existence of this stipulation or guaranty.   It was to continue
during the agreed term of the company, which was fifteen years.
It was fulfilled for the first two years; but soon after Morris,
Nicholson and Greenleaf failed, and became utterly and hopelessly
insolvent.   The company were able to declare no annual dividends,
and the guaranty of the three projectors was entirely worthless.
As a security for their engagement they had stipulated to deposit
in the hands of the trustees each 3000 shares of the stock of the
company; but this stock could neither then nor at any subsequent
time command any price in the market.   In 1807, when new or
supplementary articles were adopted in accordance with a provi-
sion contained in the original agreement, this was the condition
of things: the guarantors were hopelessly insolvent—the claim on
them for arrearages as well as for the two remaining years of the
contract, was literally good for nothing—the collateral pledged
had no market value, and was entirely unavailable.   In placing a
construction upon these supplementary articles we must take these
circumstances into consideration.   All idea of any claim on the
continuing guaranty was simply ignored; and as to the arrear-
ages, instead of providing that notice should be given, the col-
lateral sold, and the proceeds credited on account, they declare
that the stock should be taken and held in lieu of the arrearages.
" In lieu of" means in the place of—the one a substitution for the
other.   Such is the language of the 3d additional article as pro-
posed and adopted.   By the 2d article, immediately preceding, it
had been provided that the old should assign to the new trustees
" all shares of stock of the company that may have been trans-
ferred to them or in their names under the 23d article of the agree-
ment" of February 20th 1795.   It is objected that such shares
never were transferred, and therefore the consideration of the
release of the arrearages failed.   In point of fact the 7455 shares
which had been left in pledge under the 23d article, by the advice
of eminent counsel, had been put up at public sale and bought
evidently by a mere trustee for the company for the purpose of
being voted on at the annual meeting in December 1807, at which
the question of adopting the supplementary articles proposed at
the preceding annual meeting was to be decided.   By this act the
beneficial interest was certainly vested absolutely in the company,
freed from any right to redeem in the pledgors.   The transfer of
the legal title from the old trustees to the new was a mere formal
act, which the company could command at any time.   That which
a chancellor would decree shall be considered in equity as actually

[Estate of the North American Land Co.]

done. That this was the cotemporaneous construction of the transaction is manifest from the fact that the 3d article as proposed was adopted after the public sale had taken place. Thus, as we construe these agreements, the arrearages of interest then due and unpaid on the guarantee were intended to be and were released.

It appears to us equally plain that the continuing guaranty, of which only two years remained at the time of the adoption of the supplementary articles, was also intended to be and was actually released. The principal contract was materially changed, and where that is shown the surety's agreement to transfer his engagement to the new undertaking must very clearly appear. Now here the original undertaking was to make annual dividends, and the guaranty was that they should be at least 6 per cent. per annum. By the new agreement, annual dividends were done away with; and instead thereof, by the fourth article, it was agreed "that whenever the lands and property of the company shall have been all sold and the conditions of sale complied with, the said managers of the company shall, by public advertisement, call a meeting of the stockholders and shall divide among them the proceeds of the same, according to their respective interests therein." And the fifth is added, which seems to have been written with an eye to this very question, "that whatever may, in any of the articles of the aforesaid agreement of 20th February 1795, prove repugnant to or inconsistent with the supplementary articles now agreed to, shall be and is henceforward declared to be for ever rescinded and annulled." Here, too, as in regard to the question of the release of the arrearages, that this was the cotemporaneous understanding is abundantly evident. The supplementary articles were adopted December 31st 1807, and at a meeting of the managers, February 4th 1808, "the secretary communicated the form of a new certificate of shares, to be issued in all future transfers, which was approved of." The new form of certificate omitted all reference to the guaranty. At the same meeting it was resolved "whereas Robert Morris and John Nicholson, both jointly and severally, are deeply indebted to the North American Land Company," that therefore "no transfers of stock shall hereafter be admitted or made, nor interest thereon granted or paid (unless by consent of a majority of the present managers, their survivors or a majority of such survivors) in cases where there is any reason to believe that Robert Morris and John Nicholson or either of them or their legal representatives, have any equitable interest in or claim to such shares." If there had been any idea either that the arrearages were then a subsisting debt, or that the guaranty was still a continuing one, the name of James Greenleaf would not have been omitted in these proceedings. Some order would have been made at least for the future, as no one could have enter-

[Estate of the North American Land Co.]

tained any expectation that he and his co-obligors would be able to fulfil their engagement under the twenty-third article. Cotemporaneous construction is not indeed conclusive, but if any doubt rests upon the question, or, as in this case, a very long period of time has elapsed before it was made, it is certainly an argument entitled to very great weight. More than half a century has gone by, and the men engaged in these transactions have all departed. With them have died the feelings which grew out of the controversies connected with this unfortunate company. We have decided the case as one of mere abstract law, and the considerations we have thus presented seem to us amply to sustain the conclusion at which we have arrived.

The special report of the auditor confirmed and the case recommitted to him to make distribution accordingly.